Kurt Ramlo (Bar No. CA 166856)
kurt.ramlo@dlapiper.com
Bertrand Pan (Bar No. CA 233472)
bertrand.pan@dlapiper.com
Meredith Edelman (Bar No. CA 261602)
meredith.edelman@dlapiper.com
**DLA PIPER LLP (US)**
550 South Hope Street, Suite 2300
Los Angeles, CA  90071-2678
Tel:  213.330.7700
Fax:  213.330.7701

Proposed Attorneys for NexPrise, Inc., Debtor and
Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No.  11-00742-11 |
| NEXPRISE, INC., a Delaware corporation, | Chapter 11 |
| Debtor and Debtor in Possession. | **Declaration of John Lynch In Support Of First Day Motions** |
| Tax ID # 77-0465496 | Date:        TBD<br>Time:        TBD<br>Place:       Department 2, Room 118<br>               325 W. F Street<br>               San Diego, CA 92101<br>Judge:      Hon. Louise D. Adler |

I, John Lynch, declare as follows:

1.      I am the Chief Executive Officer, President, and member of the Board of Directors of NexPrise, Inc. ("NexPrise" or the "Debtor").  In these capacities, I am generally familiar with the day-to-day operations, business and financial affairs of the Debtor.  I submit this Declaration in support of the Debtor's chapter 11 petition and "first-day" relief that the Debtor has requested in the first day motions ("First Day Motions") identified below and to assist the Court and other interested parties to understand the circumstances that compelled the commencement of this chapter 11 case (the "Case").

2.      Except as otherwise stated, all facts contained within this Declaration are based on my

1    personal knowledge, my discussions with other members of the Debtor's management, my review of

2    relevant documents, and/or my opinion, relying on my experience in the industry and knowledge of the

3    Debtor's operations and finances.  If I were called upon to testify, I could and would competently

4    testify to the matters set forth herein.  I am authorized to submit this Declaration on behalf of the

5    Debtor.

6            3.      As Chief Executive Officer and President, I oversee and direct all of the

7    Debtor's business operations, including, but not limited to, financial planning, financial

8    reporting, and cash management activities, and I have been actively involved in developing

9    and implementing the Debtor's business strategies.  I have reviewed and worked extensively

10   with the Debtor's books and records, including the Debtor's financial statements and projections,

11   business plans, analyses, reports, leases, other legal documents, notes, correspondence, and the

12   like.  On a daily basis, I witness and/or participate in negotiations with creditors, vendors, and

13   customers of the Debtor, and I work closely with personnel from all aspects of the Debtor's

14   operations.  Based upon all of the foregoing, I have developed an intimate familiarity with the

15   Debtor's books and records, operational and financial details, business and financial history, and

16   current business and financial situation.

17          4.      On January 18, 2011 (the "Petition Date"), the Debtor filed a voluntary petition

18   ("Petition") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

19   Code").  The Debtor continues to operate its business and manage its affairs as a debtor in

20   possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**I.**

**INTRODUCTION**

23          5.      The Debtor filed this Case to preserve the going-concern value of its business as

24   it pursues a sale of substantially all of its assets pursuant to section 363 of the Bankruptcy Code.

25   As discussed in further detail below, after years of implementing and considering numerous

26   options to restructure its business, the Debtor decided that a sale of substantially all of its assets

27   was in the best interests of its stakeholders.  After fully marketing those assets, the Debtor

28   entered into an asset purchase agreement with the Stalking Horse Bidder (defined below) for

-2-

DLA PIPER LLP (US)
LOS ANGELES

WEST\222851030.21

**DECLARATION OF JOHN LYNCH**

$2.0 million, which agreement is subject to overbid and bankruptcy court approval.  The offer by the Stalking Horse Bidder establishes a baseline bid which other interested purchasers may improve upon pursuant to bidding procedures that the Debtor seeks to implement through the Sale Procedures and Approval Motion (defined below).  These bidding procedures will ensure that the highest or best offer for the Debtor's assets is obtained and their implementation is consistent with the Debtor's fiduciary duties to maximize value for its estate and its stakeholders. Upon information and belief, the Debtor's largest unsecured creditors, Timeline Venture Investors I, LLP ("Timeline Venture") and Sirius Industries, LLC ("Sirius"), support the Debtor's efforts to sell its assets and Debtor's entry into the assets purchase agreement with the Stalking Horse Bidder.  I have had communications with representatives of Timeline Venture and Sirius in which they indicated their support for the proposed sale.  I believe that the sale by the Debtor of substantially all of its assets to the Stalking Horse Bidder under the APA is in the best interests of the Debtor's estate and stakeholders.

6.      After the filing of the Petition, the Debtor filed (concurrently with this Declaration), the following Motions:

a.      First Day Motion By Debtor For Order (A) Authorizing Continued Use Of Debtor's Cash Management System, (B) Authorizing Maintenance And Continued Use Of Debtor's Existing Bank Accounts and Business Forms, and (C) For Other Relief (the "Cash Management Motion");

b.      First Day Motion by Debtor for Order (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utility Companies Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion");

c.      First Day Motion by Debtor for Order: (1) Authorizing, but not Requiring, Payment of Pre-Petition (A) Wages, Salaries and Other Compensation; (B) Employee Benefits; (C) Reimbursable Expenses; (D) Related Taxes; and (2) Authorizing and Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment (the "Wage Motion");

     d.       First Day Motion By Debtor For Order Limiting Scope of Notice (the "<u>Motion to Limit Notice</u>");

     e.       Motion For Orders (1) Approving Bidding Procedures And Protections And (2) Approving Sale Transaction (the "<u>Sale Procedures and Approval Motion</u>").

7.      The Debtor, through the Sale Procedures and Approval Motion, seeks to approve the sale to the Stalking Horse Bidder subject to competitive bidding in an auction process.  As detailed below, the Debtor will provide notice of the proposed sale to outside parties, who will have the opportunity to submit indications of interests and competing bids.  This will ensure that the Debtor's estate receives maximum value for the Debtor's assets.  The Debtor is seeking to consummate a sale within approximately 70 days of the petition date.  The Debtor's limited cash flow necessitates that a sale be completed as quickly as reasonably possible.

8.      Part II of this Declaration provides an overview of the Debtor's business, organizational and liability structure and a discussion of the Debtor's financial performance and the events that compelled the commencement of the Case, and the Debtor's chapter 11 goals; and Part III sets forth other relevant facts in support of the First Day Motions.

**II.**

**BACKGROUND OF THE DEBTOR'S BUSINESS<br>AND EVENTS LEADING TO CHAPTER 11 FILING**

**A.    The NexPrise Business**

9.      NexPrise is the original innovator of Enterprise Content Management ("<u>ECM</u>") solutions such as WebSpace and InfoPrise. WebSpace is part of the cloud model of computing, consisting of internet-based computing whereby shared resources, software and information are provided to computers and other devices on–demand.  The NexPrise ECM platform was originally conceived to support secure multi-organizational collaboration in the aerospace and defense industry.  Since its founding, NexPrise has developed a reputation as a global process and document management company that delivers flexible solutions with absolute immediacy.

10.     NexPrise began as a successful DARPA funded project within Lockheed Martin's Palo Alto Research Lab.  Spun off as an independent company in February 1997,

DLA Piper LLP (US)
Los Angeles

WEST\222851030.21

**DECLARATION OF JOHN LYNCH**

NexPrise Corporation has spent over 15 years developing ways to make it easier for users to collaborate and mange information online.

11.    NexPrise was acquired in 2001 by Ventro Corporation, which was formerly known as Chemdex Corporation ("Chemdex"), which was also founded in 1997 and was one of the first online business to business ("B2B") e-commerce companies.  Chemdex provided an online marketplace for sales of chemicals, enzymes, lab equipment, biotech products like peptides, and many types of chemical reagents.  Once an IPO darling of Wall Street, Chemdex was never profitable and it became one of many companies destroyed in the dot-com crash of the early 2000s.

12.    Chemdex went public on the NASDAQ exchange in July 1999 (ticker symbol CMDX).  At the time, Chemdex recorded quarterly sales of $165,000, mostly to Genentech.  Chemdex raised $112.5 million at IPO, and sold $250 million in bonds (the "Bond Issuance") to continue funding of the business.  Recognizing the early market interest of the online B2B marketplaces at that time, Chemdex renamed the company Ventro Corporation ("Ventro") in February 2000.  Ventro merged with a number of related businesses, including Specialty MD and Promedix (both specialty medical technology providers) and engaged in join ventures with Tenet Healthcare and VWR Scientific.  By 2000, the company's market capitalization had grown to over $4 billion.

13.    When, as with other similar companies, investors lost confidence in highly priced but unprofitable internet ventures, Ventro's stock plummeted to only 1% of its previous value, and, unable to find a buyer for the business, Ventro shut down its Chemdex division in early 2001.  Ventro then concentrated only on providing B2B exchange services to exchanges rather than actually running an exchange.  Because the B2B exchange services business was not active, however, Ventro began to look for an operating business to acquire.

14.    In August 2001, Ventro acquired privately held NexPrise for its web-based ECM technology and shortly thereafter changed its name to NexPrise, Inc.  NexPrise operates out of its headquarters located in Carlsbad, California and employs nine people.  NexPrise has over 50 customers and its product usage has spread to over 25,000 users across multiple industries including aerospace, defense, automotive, high-tech, pharmaceutical, and medical device

companies.

**B.    The Debtor's Recent Financial History**

15.    The Debtor's revenue has been relatively flat from the years 2005 through 2009, running at an average of approximately $2.4 million per year.  While the Debtor believes that it would have steadily increasing revenue over the next two years, the Debtor has not been servicing its funded debt from its Bond Issuance since 2005,[1] and despite the Debtor's historical and projected revenue, the Debtor has limited cash flow and would soon be unable to meet some of its other obligations.

16.    Over the past six years, the Debtor has attempted to recapitalize, reorganize, or restructure so that it could acquire new capital to grow its business in light of its projected increases in revenues.  These efforts, however, have been unsuccessful primarily due to the outstanding debt remaining from the Bond Issuance.  Through proposals such as conversion and buy-back offers, the Debtor was able to reduce the original $250 million debt from the Bond Issuance to the approximate $4.8 million amount that remains outstanding today.  The holders of the remaining $4.8 million have not responded to the Debtor's proposals to restructure their debt. The Debtor believes these holders are small stakeholders who have written off or abandoned their investment and thus are not easily locatable.

**C.    The Debtor's Management Team**

17.    As stated above, I am the Chief Executive Officer and President, and a member of the Board of Directors.  Patrick Clark is the Chairman of the Board of Directors.  Ted Lesher is the Vice President of Sales & Marketing.  Steven Smith is the Director of Professional Services.  Brian Deng is the Director of Product Development.

**D.    Corporate Structure and Ownership**

18.    The Debtor is a publicly traded corporation (ticker symbol NXPS.PK ) whose shares of common stock trade "over-the-counter" on the "pink sheets," i.e., Pink Quotes from the Pink Quote OTC, Inc..  There are 3,389,791 shares of common stock outstanding.  A List Of Equity Security Holders (holders of common stock) of the Debtor has been filed concurrently

---

[1] Note: the bond debt has not been paid since 2005; Sirius and Timeline debts have been paid more recently.

DLA PIPER LLP (US)
LOS ANGELES

WEST\222851030.21

**DECLARATION OF JOHN LYNCH**

with the Petition.  The Debtor deregistered with the SEC in 2005 and no longer files reports with the SEC.

### E.    Asset and Debt Structure

#### 1.    Current Assets

19.    The Debtor's most recent financial statements indicate that as of January 12, 2011, the book value of the Debtor's current assets were $455,479.41, including $57,812.38 of cash on hand.  As of January 12, 2010, the book value of Debtor's total assets was $519,553.74.

#### 2.    Secured Debt

20.    Upon information and belief, the Debtor currently has no secured debt obligations.

#### 3.    Unsecured Debt

21.    As of the Petition Date, the Debtor has approximately $6.8 million of priority and general unsecured obligations that are held by approximately 100 creditors, including employees.

22.    To the best of the Debtor's knowledge, its largest unsecured creditors are Timeline Venture and Sirius.  Timeline holds an unpaid note with balance of approximately $1.2 million.  The Debtor's obligations under the note have been the subject of a forbearance agreement with Timeline Venture, but the Debtor is no longer current on its obligations to Timeline Venture under the note as modified by the forbearance agreement.

23.    The Debtor's second largest unsecured creditor is Sirius, which holds a note with an approximately $630,000 balance.  The Debtor remained current on its interest payment obligations under this note through October 2010.

24.    As noted above, there are approximately $4.8 million in outstanding subordinated bonds, the holders of which have not responded to the Debtor's proposals to restructure their debt.  The Debtor believes these holders are small stakeholders who have written off or abandoned their investment and thus are not easily locatable.  By agreement, payment to the subordinated bondholders is subordinated to the payment of the Debtor's obligations to Timeline Venture, Sirius, and other general unsecured creditors.

DLA Piper LLP (US)
Los Angeles

WEST\222851030.21                                    **DECLARATION OF JOHN LYNCH**

25.    Through its Wage Motion, the Debtor is seeking the authority to honor all of its employee benefit programs in the ordinary course of business, subject to applicable statutory limits.

26.    The Debtor is generally current on its obligations to its suppliers, vendors, and other trade creditors.  The Debtor estimates that there will be approximately $90,000 in prepetition trade creditor claims as of the Petition Date.

**F.    Sale of Assets**

27.    As detailed in Sale Procedures And Approval Motion, the Debtor is seeking to sell substantially all of its assets.  The Debtor and the Stalking Horse Bidder have entered into a January 17, 2011 asset purchase agreement (the "APA") with respect to the sale and purchase of those assets for $2.0 million.

**1.    Alternatives to Sale**

28.    As noted above, the Debtor made offers to convert or buy back debt from the Bond Issuance and through the years significantly reduced the amount of the Bond Issuance from $250 million to approximately $4.8 million.  During the past year, the Debtor negotiated with the Indenture Trustee about various proposals to restructure the remaining $4.8 million.  Those negotiations ultimately broke down when the Indenture Trustee demanded payment from the Debtor of certain expenses, including the payment in full of accrued administrative fees under the indenture and attorney's fees incurred by the Indenture Trustee, before the Indenture Trustee would continue negotiations.  The Debtor's cash flow situation at the time made such a payment untenable.  Thus, negotiations did not continue.  The Debtor has also explored restructuring the company with its largest creditors, Timeline Ventures and Sirius Industries.  Those efforts were also unsuccessful.  The Debtor has attempted to raise capital from other sources, including third party lenders and other investors, but those efforts were also unsuccessful.  I believe that the lack of viable out-of-court restructuring alternatives has left the Debtor with no other choice but to sell its assets through a bankruptcy process.

**2.    Marketing of Assets and Decision to Sell**

29.    In early August 2010 (after consultation with its largest creditors, Timeline

1   Ventures and Sirius Industries), the Debtor began an extensive marketing and sale process,

2   aggressively canvassing the marketplace to locate potential purchasers.  The Debtor interviewed

3   several investment banks to assist in this process, but determined that the cost of marketing the

4   company through an investment bank would not be nearly as cost efficient as having the company

5   market its assets on its own.  Thus, the Debtor chose to market its assets on its own with the

6   fallback of using an investment bank if its marketing efforts were unsuccessful.  During August

7   and September 2010, the Debtor utilized analyst reports from industry research organizations

8   such as Gartner and Forrester Research, along with its own knowledge of companies in the

9   industry to identify potential purchasers whose businesses were compatible with that of NexPrise

10  and who were in a financial position to acquire NexPrise's assets.

11          30.     Through this process, NexPrise contacted approximately 50 potential purchasers.

12  Among other things, NexPrise provided these entities with details regarding the company's

13  products, customers, users, revenue, and employees.   Approximately 10 of the solicited entities

14  asked NexPrise for additional information and NexPrise continued a dialogue with those entities.

15  Additionally, NexPrise received a referral from one of the solicited entities to a company

16  NexPrise had not originally targeted, Trubiquity, Inc (the "Stalking Horse Bidder").  Further

17  communications with the Stalking Horse Bidder and other entities led to the Debtor giving

18  presentations to five entities that had expressed an interest in acquiring NexPrise's assets.  After

19  these presentations, three of the five entities asked NexPrise for detailed face-to-face technical

20  demonstrations.  At the conclusion of the technical demonstrations, only the Stalking Horse

21  Bidder chose to proceed with an offer to purchase NexPrise's assets.

22          31.     The Debtor, in consultation with its advisors, engaged in arm's-length, good-faith

23  negotiations with the Stalking Horse Bidder.  Following extensive negotiations, on November 4,

24  2010, the Debtor signed a letter of intent (the "Letter of Intent")  with the Stalking Horse Bidder

25  expressing the intent to negotiate an asset purchase agreement.  On January 17, 2011, the Debtor

26  and the Stalking Horse Bidder, after negotiations involving their respective counsel, entered into

27  the APA.  If any other qualified bidder submits a timely qualified bid, the Debtor intends to

28  conduct a Court-approved auction and to sell the assets to the highest and best bidder at that

DLA PIPER LLP (US)
LOS ANGELES

WEST\222851030.21

**DECLARATION OF JOHN LYNCH**

auction, subject to Court approval.

### 3.    Asset Valuation

32.    The Debtor has not commissioned any formal valuations of the Debtor's assets due to the attendant high expenses of doing so.  The Debtor, however, believes that it has market tested the value of its assets though the marketing process described above and that this marketing process, together with the auction process outlined in Sale Procedures and Approval Motion, will appropriately value the Debtor's assets.

### 4.    Relationship of Buyer

33.    To the best of my knowledge, the Stalking Horse Bidder does not have any connections with the Debtor, its creditors, any other party in interest, their respective attorneys, accountants, the United States Trustee or any person employed in the office of the United States Trustee.

### 5.    Post-Sale Relationship with Debtor

34.    To the best of my knowledge, the Stalking Horse Bidder intends to hire all the current employees of the Debtor after the consummation of the sale, assuming it is approved.

### 6.    Insider Compensation

35.    I have an employment agreement with the Debtor dated April 1, 2009.  Under my employment agreement, I receive an annual salary of $250,000.00, plus the opportunity to participate in certain benefits and programs, including health, dental, vision, and paid time off.

36.    Director and Chairperson of the Board of Directors Pat Clark has a consulting agreement with the Debtor under which he is paid $108,000 annually.

## III.

## FIRST DAY MOTIONS

### A.    Cash Management Motion

37.    Pursuant to the Cash Management Motion, the Debtor seeks an order from this Court: (i) authorizing the Debtor to maintain its existing cash management system and business forms; (ii) waiving the requirements that, as of the date of the filing of the petition, the Debtor

-10-

close its existing bank account – and open new – "debtor-in-possession" books, records, and bank accounts; (iii) directing banks and financial institutions to honor and process prepetition checks and transfers; and (iv) waiving certain guidelines promulgated by the United States Trustee.

38.    To maximize the estate's value and reorganize efficiently, the Debtor must continue to use its existing bank account and cash management system. Maintaining the prepetition status of its cash management system allows the Debtor to continue the uninterrupted operation of its business. Essentially, the Debtor maintains a centralized cash management system, involving established banking relationships and a single account to manage and control receipts and disbursements.

39.    The Debtor's cash management system allows the Debtor to effectively and efficiently run its business. The Debtor believes that the success of its reorganization is best ensured by minimal interference with its ordinary day-to-day affairs, including its current cash management system, which is essential to its business. Disturbance of the Debtor's existing cash management system would disrupt the Debtor's ability to maximize the value of its assets for the benefit of all of its creditors and employees.

40.    Additionally, and in the ordinary course of its business, the Debtor uses checks labeled "NexPrise", stationery labeled "NexPrise" and other business forms, including electronic business forms, stamped with "NexPrise." Based on the nature and scope of the Debtor's business – and the many other parties with whom the Debtor transacts – altering or changing the Debtor's checks, stationary, and other business forms would needlessly affect the ease with which the Debtor conducts business. Although altering or changing these items is possible, significant time and expense would be required. The Debtor submits that printing new checks, stationary, and other business forms would engender confusion and create undue delay among its employees, customers and other third parties.

41.    To that end, the Debtor requests authorization to continue using its electronic business forms (including, but not limited to, letterhead and purchase orders) and its checks for at least 60 days without the imprinted designation of "debtor in possession." This will give the Debtor enough time to modify its electronic checks and business forms to include reference to

"Debtor in Possession" and the Case number.

42.     The Debtor requests authorization to continue using all existing checks and preprinted business forms without reference to its "debtor in possession" status until such forms are depleted, at which time the Debtor, if it is still a debtor in possession, will order forms with "Debtor in Possession" and the case number printed on them. The manner that the Debtor conducts business requires that the Debtor be authorized to continue using the above described forms and checks without alteration or modification until appropriate arrangements may be made. Sixty (60) days is a reasonable amount of time to alter its electronic business forms and checks. If the Debtor can make these modifications any sooner, it will immediately begin using forms that have "Debtor in Possession" printed on them.  As a result of the Debtor following proper notice procedure, as set forth by the Bankruptcy Rules and the Local Bankruptcy Rules, those conducting business with the Debtor will already undoubtedly be aware of the Debtor's "debtor-in-possession" status.

43.     Additionally, section B of the Operating and Reporting Requirements for Chapter 11 Cases (the "UST Operating Requirements") provided by the United States Trustee (the "UST") for the Southern District of California sets forth certain requirements related to books, records and bank accounts, as discussed in more detail in the Cash Management Motion.  The Debtor is seeking a waiver from these UST Operating Requirements because the Debtor intends to sell substantially all its assets and then cease operations.  Compliance with the UST Operating Regulations will be costly and will unnecessarily disrupt the Debtor's ongoing business operations pending a sale, significantly jeopardizing revenue.

44.     The relief requested by the Cash Management Motion is necessary and in the best interests of the Debtor's estate and its creditors.  Such relief ensures that the Debtor's business operations will not be disrupted pending the contemplated sale under section 363 of the Bankruptcy Code.

**B.     Utilities Motion**

45.     Pursuant to the Utilities Motion, the Debtor seeks an order from this Court approving procedures for providing its utility companies with adequate protection.  To ensure the

DLA PIPER LLP (US)
LOS ANGELES

WEST\222851030.21                                    **DECLARATION OF JOHN LYNCH**

continued and uninterrupted provision of utility services (the "Utility Services") to the Debtor, the Debtor seeks entry of an order prohibiting utility companies (each, a "Utility Company") from altering, refusing, or discontinuing any Utility Service.

46.    Attached as Exhibit "A" to the Utilities Motion is a list of the Utility Companies, the type of service provided by each Utility Company and the average monthly amount invoice by each Utility Company during the prior twelve (12) month period.

47.    At this critical time, and given the nature of the Debtor's business, uninterrupted Utility Services are essential to the ongoing operations of the Debtor's business and to the preservation of value of the Debtor's estate.  Any interruption in the delivery of Utility Services, however brief, will be disruptive to the Debtor's operations.

48.    In general, the Debtor has established a good payment history with all of the Utility Companies, consistently making payments on a regular and timely basis.  To the best of my knowledge, there are few, if any, defaults or arrearages of any significance with respect to the Debtor's undisputed invoices for prepetition Utility Services, other than payment interruptions that may be caused by the commencement of this chapter 11 case.  The Debtor anticipates that it will pay all utility bills for the postpetition Utility Services as billed and when due subject to the Debtor's rights, if any, in the ordinary course, to contest, among other things, the amount of a bill or the services rendered.

49.    The Debtor proposes to give, within thirty (30) days of the Petition Date, the Utility Companies adequate assurance of payment for its future services in the form of cash deposits (the "Adequate Assurance Deposit(s)") in amounts that are equal to the average monthly amount invoiced by each Utility Company during the prior twelve (12) month period, as listed in Exhibit "A" to the Utilities Motion, minus the amount of any security deposit or certificate of deposit already made to, or for the benefit of each Utility Company.

50.    The Debtor submits that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future Utility Services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitute adequate assurance to the Utility Companies as contemplated by section 366 of the Bankruptcy Code.

DLA Piper LLP (US)
Los Angeles

WEST\222851030.21

DECLARATION OF JOHN LYNCH

51.     In light of the severe consequences to the Debtor of any interruption in Utility Services, but recognizing the right of the Utility Companies to evaluate the Proposed Adequate Assurance independently, the Debtor proposes the following Adequate Assurance Procedures, to the extent a Utility Company is not satisfied with the Proposed Adequate Assurance:

(a)     If a Utility Company is not satisfied with the assurance of future payment provided by the Debtor, such Utility Company must, within 30 days of the entry date of the order granting this Utilities Motion (the "Request Deadline") serve a written request (a "Request") so that it is actually received by the Request Deadline upon counsel for the Debtor, DLA Piper LLP (US), 550 S. Hope Street, Suite 2300, Los Angeles, California 90071-2678 (Attention: Bertrand Pan), setting forth the location(s) for which Utility Services are provided, the account number(s) for such location(s), the outstanding balance for each account, a summary of the Debtor's payment history on each account, and an explanation of why the Adequate Assurance Deposit is not adequate assurance of future payment.

(b)     Without further order of the Court, the Debtor, in its sole discretion, may, but is not required, to enter into agreements granting additional adequate assurance to a Utility Company timely serving a Request, if the Debtor determines such Request is reasonable.

(c)     If the Debtor believes that a Request is unreasonable, then it shall, within 30 days after the Request Deadline, file a motion (the "Determination Motion") pursuant to 11 U.S.C. § 366(c)(3) seeking an order that the Adequate Assurance Deposit, plus any additional consideration offered by the Debtor, in its discretion, constitutes adequate assurance of payment.  Pending notice and a hearing on the Determination Motion, the Utility Company that is the subject of an unresolved Request may not alter, refuse, or discontinue any Utility Services to the Debtor, or otherwise discriminate against the Debtor.

(d)     The Adequate Assurance Deposit shall be deemed adequate assurance of payment for any Utility Company that fails to timely make a Request.

52.     The Debtor reserves the right to supplement the list of Utility Companies attached as Exhibit "A" to the Utilities Motion, without further order of the Court, if a Utility Company has been omitted, mistakenly included, or commences providing Utility Services to the Debtor postpetition.  To the extent the Debtor identifies additional Utility Companies, the Debtor will promptly file an amendment to the list of Utility Companies, as identified on Exhibit "A" to the Utilities Motion, adding the name and other information of the newly-identified Utility Company, and promptly serve copies of the order (the "Utilities Order") granting this Utilities Motion on

1  such newly-identified Utility Companies (the "Supplemental Service").

2        53.     The Debtor will provide an Adequate Assurance Deposit for the newly-identified

3  Utility Company within 30 days of the entry of the Utilities Order or on or before 30 days after

4  the Supplemental Service, whichever is later.  If the newly-identified Utility Company has not

5  provided Utility Services to the Debtor prior to the Petition Date, then such Adequate Assurance

6  Deposit will be equal to the Debtor's expected monthly invoice amount for the Utility Services to

7  be provided.  The newly-identified Utility Company shall have 30 days from the date of the

8  Supplemental Service to make a Request.  If such Request is made, the Adequate Assurance

9  Procedures, as detailed above, shall apply to this Court's consideration and resolution of such

10  Request.

11        54.     The Debtor additionally requests that the Utilities Order provide that the Utility

12  Companies must refund any Adequate Assurance Deposit to the Debtor within ten (10) business

13  days of (x) the date the Debtor terminates the services of a Utility Company or (y) the date of

14  entry of an order closing this chapter 11 case, if not returned or applied earlier, whichever date is

15  later.

16        55.     The Debtor's Proposed Adequate Assurance, in conjunction with the Adequate

17  Assurance Procedures, are not prejudicial to the rights of any Utility Company, and the

18  importance of the continuation and uninterrupted flow of Utility Services cannot be understated.

19  The relief requested by the Utilities Motion is necessary and in the best interests of the Debtor's

20  estate and its creditors.  Such relief ensures that the Debtor's business operations will not be

21  disrupted, as well as provides the Utility Companies and the Debtor with an orderly, fair

22  procedure for determining adequate assurance.

23      **C.**    **Wage Motion**

24        56.     Due to the highly technical nature of its business, the value of the Debtors' assets

25  depends on a highly skilled and trained workforce.  The Debtor employs nine (9) individuals (the

26  "Employees"), each of whom performs a function that is critically important to the Debtor's

27  efforts.  All of the Employees are full-time.  All of the Debtor's Employees are paid

28  semimonthtly (*i.e.,* twice every month) by way of direct deposit.  Employees are paid on a salary

DLA PIPER LLP (US)
LOS ANGELES

WEST\222851030.21

**DECLARATION OF JOHN LYNCH**

basis, and some employees also receive commissions based on total sales.  The Debtor's last

payroll was issued on January 14, 2010 and covered the period from January 1, 2011 through

January 15, 2011. The next payroll is expected to take place on January 31, 2011 (the "Next

Payroll") and will cover the period from January 16 through January 31, 2011 and is expected to

total approximately $47,000.  $4,525.60 of the Next Payroll covers the period from January 16,

2011 to January 17, 2011, which is the entire prepetition period for which Wages are owed

(collectively, the "Prepetition Wages").

57.    Pursuant to the Wage Motion, the Debtor is seeking authority to honor the

Employees' wages and other payment obligations related to the prepetition period (the

"Prepetition Employee Obligations") in the ordinary course of business.  As of the Petition Date,

the Debtor has paid all Prepetition Employee Obligations, except for 1) the Prepetition Wages, 2)

amounts that may owed under the Debtor's policy for paid time off, pursuant to which Employees

are generally paid for any unused vacation or sick leave at the time employment is terminated, 3)

certain amounts owed to Employees under the Debtor's policy of reimbursing certain business-

related expenses, and 4) any commissions that may have been earned prepetition.  Accordingly,

the Debtor seeks authority to continue, in the ordinary course of business, those policies and

practices established prior to the Petition Date.  Specifically, the Debtor is requesting that the

Court enter an order authorizing, but not requiring, the Debtor to: (i) honor, in its discretion,

subject to applicable statutory limitations, and in accordance with the policies and practices

established prior to the Petition Date, all accrued wages, salaries, and other compensation,

including, without limitation, medical, dental and vision insurance coverage, disability insurance,

accidental and death and dismemberment, life insurance workers' compensation insurance,

reimbursable expenses, and retiree health benefits that have been earned and accrued by virtue of

the services rendered by the Employees prior to the Petition Date; (ii) utilize "paid time off" in

the ordinary course of business (notwithstanding the statutory cap) and to pay terminated

employees for prepetition compensation; (iii) pay all applicable federal, state and local taxes,

deductions and withholdings in connection with the payments made as described under paragraph

(i), as set forth above, and to forward the Employee Deductions to the appropriate agency or

third-party plan administrator(s); (iv) pay all amounts on account of certain business-related expenses which may not have been presented for payment or may not have cleared the financial institutions as of the Petition Date; (v) authorize and direct financial institutions to receive, process, honor and pay all checks presented for payment, and to reissue checks as and when necessary to cover amounts owing on any checks that have been dishonored by any financial institution.

58.     A failure to pay the Prepetition Employee Obligations would likely create personal hardship for the Employees, be extremely detrimental to the Employees' loyalty and morale, and would likely result in Employees resigning, thereby jeopardizing the Debtor's ability to consummate a sale or other change-of-control transaction that will provide maximum value to the Debtor's estate.  Since the Debtor's goal is to maximize the value of its assets for the benefit of the estate and its creditors, it is imperative that the Debtor be authorized, but not required, to pay or honor, in its discretion, the Prepetition Employee Obligations including, without limitation, prepetition wages, salaries and certain employee benefits, and to minimize any adverse impact that this bankruptcy proceeding may have on the Debtor's workforce and the orderly administration of the estate.  Specific information related to each of the Prepetition Employee Obligations and the relief requested in the Wage Motion is set forth in the Wage Motion.

**D.     Motion to Limit Notice**

59.     By the Motion to Limit Notice, the Debtor seeks an order authorizing it limit notice of the following Limited Notice Matters (as defined below) in this case to the following parties: (1) the Office of the United States Trustee; (2) counsel for any official unsecured creditors committee appointed in this chapter 11 case, or until such time as counsel is named, members of the committee, or until such time as a  committee is appointed, the creditors appearing on the list of the twenty largest unsecured creditors filed in accordance with Bankruptcy Rule 1007(d); (3) any creditors asserting secured claims; (4) parties that file with the Court and serve upon the Debtor request for notice of all matters in accordance with Bankruptcy Rule 2002; (5) U.S. Bank, N.A. as Trustee for 6% Convertible Subordinated Notes Due 2007; (6) Trubiquity, Inc.; and (7) any party with a specific pecuniary interest of which the Debtor is aware with respect to a particular filing.

If the relief requested in the Motion to Limit Notice is granted, the burden, complication, delay and cost to the Debtor's estate that is associated with administering this case and providing notice of the proceedings in this case to numerous parties would be dramatically reduced.

60.    The Debtor's mailing matrix in this case contains approximately 100 creditors and other interested parties.  The Debtor may identify additional creditors and anticipates that various other parties may make claims against the estate.  Requiring notice to and service upon all of these parties would substantially increase the cost of administering the estate without conferring any meaningful benefit on the estate.  The Debtor submits that the limited scope of notice proposed herein is necessary to avoid the administrative burdens and costs that serving notice of all pleadings on these parties would impose upon the Debtor while assuring that the interested parties in this case receive proper and sufficient notice of all matters.

The Debtor requests that the Court limit the scope of notices, motions, or applications, including, but not limited to, the following matters (the "Limited Notice Matters"):

a)    any proposed use, sale or lease of property of the estate other than in the ordinary course of business pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 4001(b) and 6004;

b)    any proposed assumption, rejection, or assumption and assignment of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code or Bankruptcy Rule 6006(a) or (c);

c)    any proposed extension of the Debtor's exclusive time to file a plan of reorganization and solicit acceptance thereof (including, without limitation, the time to file a disclosure statement) pursuant to section 1121 of the Bankruptcy Code or Bankruptcy Rule 3016;

d)    any proposed approval or compromise or settlement of a controversy pursuant to Bankruptcy Rules 2002(a)(3) and 9019;

e)    any proposed abandonment or disposition of property of the estate and the hearing, if any, thereon, pursuant to section 554 of the Bankruptcy Code or Bankruptcy Rule 6007(a) or (c);

f)    any proposed modification of the automatic stay pursuant to section 362 of the Bankruptcy Code or Bankruptcy Rules 4001(a) or 9014;

g)    any proposal to prohibit or condition the use, sale or lease of property pursuant to section 363 of the Bankruptcy Code or Bankruptcy Rule 4001 (a);

h)    any proposal to obtain credit on a secured basis or out of the ordinary course of business or grant a lien pursuant to section 364 of the Bankruptcy Code or

1      Bankruptcy Rule 4001(b) or (c);

i)      any proposed agreement relating to relief from the automatic stay, prohibiting or conditioning the use, sale or lease of property, providing adequate protection, use of cash collateral and obtaining credit pursuant to sections 361, 362, 363, or 364 of the Bankruptcy Code or Bankruptcy Rule 4001(d);

j)      any proposed application for employment of professionals pursuant to sections 327,1103, and/or 1104 of the Bankruptcy Code or Bankruptcy Rule 2014;

k)      any proposed application for compensation or reimbursement of expenses of professionals, pursuant to sections 328, 329, 330, or 331 of the Bankruptcy Code or Bankruptcy Rules 2002(a)(6), 2016, 2017 and 6005 and compensation to debtors' insiders pursuant to Local Bankruptcy Rule 4002-2;

l)      any verified statement filed by any entity or committee (other than those appointed pursuant to section 1102 and 1104 of the Bankruptcy Code) representing more than one creditor pursuant to Bankruptcy Rule 2019(a) and any motion filed in respect thereof pursuant to Bankruptcy Rule 2019(b);

m)      any proposed objections to claims pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3012;

n)      any proposed reconsideration of claims pursuant to Bankruptcy Rule 3008;

o)      any proposed valuation of security pursuant to section 506 of the Bankruptcy Code or Bankruptcy Rule 3012;

p)      any proposed redemption of property from lien or sale pursuant to Bankruptcy Rule 6008; and

q)      any hearing on any contested matter in this case that requires notice to creditors pursuant to the Bankruptcy Code, Bankruptcy Rule 9014 or the Local Rules.

61.      Notwithstanding the foregoing, the Debtor is prepared to provide notice to all creditors and interested parties of hearings on any proposed disclosure statement and plan of reorganization and other actions requiring notice as described in Bankruptcy Rules 2002(a)(4), (5), (7) and (8).

DLA Piper LLP (US)
Los Angeles

WEST\222851030.21

**DECLARATION OF JOHN LYNCH**

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.  Executed on January 18, 2011.

3

4                                                    _____

                                                     John Lynch

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28